IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-625-FL

| | |
|---|---|
| DASH BPO, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GREG E. LINDBERG and GLOBAL )<br>CREDIT & COLLECTION )<br>CORPORATION, d/b/a Affinity Global, )<br>)<br>Defendants. ) | ORDER |

This matter is before the court on defendants' motion to dismiss for failure to state a claim or for improper venue, or in the alternative to transfer venue (DE 26). The motion has been briefed fully, and in this posture the issues raised are ripe for ruling. For the following reasons, the motion to dismiss for failure to state a claim is granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action on November 23, 2020, and filed the operative amended complaint on March 31, 2021, asserting that defendants fraudulently concealed information regarding criminal conduct of defendant Greg E. Lindberg ("Lindberg") and induced plaintiff to enter into a business agreement (the "Agreement") with defendant Global Credit & Collection Corporation, d/b/a Affinity Global ("Affinity"). Plaintiff asserts a common law claim for fraudulent concealment, as well as a violation of the North Carolina Unfair and Deceptive Trade Practices Act. In the alternative plaintiff asserts a violation of the Illinois Consumer Fraud and

Deceptive Practices Act and the Florida Deceptive and Unfair Trade Practices Act.[1] Plaintiff seeks relief in the form of rescission of the Agreement, piercing of the corporate veil, and damages, including compensatory, punitive, and trebled damages, as well as costs and attorney's fees.

Defendants filed the instant motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(3), and in the alternative to transfer venue to the Northern District of Illinois.[2] Defendants rely upon a declaration of Saket Sahoo, president and chief operating officer of Affinity, solely in support of that part of the motion related to venue. Plaintiff filed a response in opposition and defendants replied.

## STATEMENT OF THE FACTS

The facts alleged in the complaint[3] may be summarized as follows. Plaintiff is a Delaware limited liability company whose members are residents of Florida. Defendant Affinity is a Delaware corporation that conducts "substantial business" in North Carolina and maintains a "principal office" in Illinois. (Compl. ¶ 2). Defendant Lindberg is resident of Durham County, North Carolina, who is "temporarily housed at a federal prison camp located in Montgomery, Alabama." (Id. ¶ 3).

In 2003, Daniel Elmalem ("Elmalem") formed defendant Affinity, which he operated until 2017 to provide "multi-national customer management solutions, including contact center services to the financial services and telecommunications markets, customer contact services, first party

---

[1] On June 2, 2021, plaintiff voluntarily dismissed additional claims for tortious interference with contract and tortious interference with prospective economic advantage against defendant Lindberg.

[2] Defendants filed earlier a motion to dismiss the original complaint, which the court denied as moot upon filing of the operative amended complaint.

[3] All references to the "complaint" in this order, or to "compl." in citations, are to the operative amended complaint (DE 22), unless otherwise specified.

2

receivable management, and third-party debt recoveries, from its principal office location in Chicago, Illinois, and other offices in Canada." (Id. ¶ 7).

Defendant Affinity also "facilitated debt collection for large corporate clients through first party customer care contracts," one of which was a "General Services Agreement with Bank of America," (the "BOA Contract"), a bank based in Charlotte, North Carolina. (Id. ¶ 8). The term of the BOA Contract ran from September 1, 2016 through August 31, 2019 (the "Initial Term"). (Id. ¶ 9).

According to the complaint, defendant Lindberg is the founder, former chief executive officer, and "current member and manager of Eli Global, LLC, a/k/a Global Growth, LLC ('Eli Global'), a holding company through which Lindberg owns and controls hundreds of entities that conduct various business worldwide." (Id. ¶ 11). Through these entities, defendant Lindberg and Eli Global are "engaged in business activities in industries as diverse as publishing, healthcare, and insurance." (Id. p. 3 n. 1). Defendant Lindberg allegedly is "the sole managing member of Eli Global" and "the sole, top-level decision-maker for Eli Global and its wholly-owned subsidiary companies." (Id. ¶¶ 11, 14).

On August 22, 2017, defendant Lindberg formed GCC US Holdings, LLC ("GCC Holdings"), a North Carolina company, "for the purpose of acquiring [defendant Affinity's] shares and adding it to Eli Global's portfolio." (Id. ¶ 12). On October 5, 2017, allegedly at Lindberg's direction, GCC Holdings acquired the shares of [defendant] Affinity in a stock transaction whereby it "acquired the rights to some, but not all, of [defendant Affinity's] client contracts." (Id. ¶ 13). According to the complaint, Eli Global is the "sole managing member of GCC Holdings, which is the sole owner of" defendant Affinity. (Id. ¶ 14). "Upon further information and belief, Lindberg

3

. . . completely dominated and controlled, and dominates and controls, the decisions and operations of Eli Global, GCC Holdings and [defendant] Affinity." (Id.).

"GCC Holdings did not acquire the rights to the BOA Contract in the stock transaction." (Id. ¶ 15). "Rather, Elmalem formed Dash on August 17, 2017 to continue performance under the BOA Contract following [defendant] Lindberg and GCC Holding's acquisition of [defendant Affinity's] stock." (Id.). "After the stock transaction, Lindberg, through GCC Holdings, continued [defendant Affinity's] operations from Dash's primary office location in Chicago, Illinois." (Id. ¶ 16).

"In early 2018, Dash considered moving its business operations to a new location." (Id. ¶ 17). "Around the same time, Elmalem spoke with Scott McIlroy," ("McIlroy"), defendant Affinity's new president and chief operating officer, who "told Elmalem that [defendant Affinity] was considering moving part of its first party outsourcing operations from Chicago to Dallas." (Id. ¶ 18). "Elmalem and McIlroy, on behalf of [defendant Affinity] and [defendant] Lindberg, began discussing the possibility of Dash outsourcing its first party customer care contract work to Affinity Global, which Affinity Global would perform from its new office in Dallas, Texas." (Id.).

"These negotiations included, most notably, the BOA Contract that, at the time, represented approximately $5,000,000 in annual gross revenues collected, resulting in approximately $1,200,000 in annual profit to Dash." (Id. ¶ 19). Defendant Affinity and Lindberg allegedly "were aware of the lucrative nature of the BOA Contract based on Dash's past performance and expected future performance thereunder." (Id. ¶ 20). "During the negotiations, McIlroy was [defendant Affinity's] designate agent for the contemplated transaction." (Id. ¶ 21). According to the complaint, "[d]uring the negotiations, which occurred over multiple phone calls and in emails in April, May and June 2018, McIlroy, on behalf of [defendant Affinity] and Lindberg, represented,

4

inter alia, that its new location in Dallas would be a great fit for ensuring continued success with Bank of America; that [defendant Affinity] would have sufficient oversight for the BOA Contract in terms of quality assurance, compliance, and security protocols; that [defendant Affinity] had the sufficient financial support to effectively run the program and perform Dash's obligations under the contract; and that [defendant Affinity] executives, including [defendant] Lindberg, supported the deal." (Id. ¶ 21).

According to the complaint, "[u]pon information and belief, McIlroy discussed the terms of the proposed deal with Vishal Kumar, Eli Global's portfolio manager, and [defendant] Lindberg, and shared drafts of the proposed agreement with them." (Id. ¶ 22). "Upon further information and belief, Lindberg ultimately made the decision to consummate the deal with Dash and directed McIlroy to sign the agreement for [defendant] Affinity." (Id.).

On June 7, 2018, Dash and defendant Affinity executed the Agreement. (See Compl. Ex. A (DE 1-1) at 5). By way of summary, the agreement provided for Dash "to broker its existing clients to [defendant Affinity] to continue providing and assign its first party customer care contracts, namely the BOA Contract, to [defendant Affinity] (the 'Assigned Contracts'), in exchange for Affinity Global paying Dash on a monthly basis (1) a percentage of gross revenues [defendant Affinity] collected under the contracts (the 'Percentage of Revenues'); and (2) broker fees in relation to the BOA Contract." (Id. ¶ 23). In this manner, according to the complaint, "Dash assigned its performance obligations to [defendant Affinity] while still receiving a benefit from the BOA Contract." (Id. ¶ 24).

"The Agreement obligated [defendant Affinity] to produce a revenue report each month identifying the amount of gross revenues generated by each of Dash's clients in the immediately preceding calendar month and the Percentage of Revenues owed to Dash." (Id. ¶ 25). "Payment

5

of the Percentage of Revenues was due by [defendant Affinity within] 30 days from the date of the revenue report." (Id. ¶ 24). "The Agreement also obligated [defendant Affinity] to begin paying broker fees at the earlier of (1) the time when Bank of America installed proprietary equipment necessary to perform the BOA Contract at [defendant Affinity's] new location in Dallas, Texas; or (2) January 1, 2019, if [defendant Affinity] decided to keep its operations in Chicago, Illinois." (Id. ¶ 26).

According to the complaint, "[b]ased on the historical and expected gross revenues generated under the BOA Contract, Dash . . . expected to receive a Percentage of Revenues of approximately $325,000.00 annually, under the Agreement, in perpetuity." (Id. ¶ 27). "Bank of America consented to Dash's assignment of the BOA Contract and agreed to permit and facilitate the installation of proprietary Bank of America assets at [defendant Affinity's] new office location in Dallas, Texas." (Id. ¶ 28).

According to the complaint, defendant Affinity "began preparations to move its operations to Dallas by the end of 2018 or beginning of 2019. However, because of certain IT-related delays, the expected launch of [defendant Affinity's] Dallas office was delayed to the Spring of 2019." (Id. ¶ 29). "As of April 2019, the final step for the Dallas buildout was Bank of America approving the final network connections to their national data center." (Id. ¶ 23).

"However, on March 18, 2019, a grand jury in the United States District Court for the Western District of North Carolina returned an indictment charging [defendant] Lindberg and three other co-conspirators with one count of conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349, and one count of bribery in violation of 18 U.S.C. § 666(a)(2) and (2)." (Id. ¶ 31).[4]  The allegations in the indictment are summarized in the complaint as follows:

---

4       The court also takes judicial notice of the fact of the filing of the indictment in the United States District Court for the Western District of North Carolina and the fact that the indictment alleged criminal conduct on the part

As set forth in the indictment, between April 2017 and August 2018, Lindberg and his co-conspirators engaged in an unlawful scheme to funnel $2,000,000 in bribes to Mike Causey, the North Carolina Commissioner of Insurance, ['Commissioner Causey'] in exchange for Commissioner Causey undertaking official action favorable to Lindberg. Specifically, the scheme involved Lindberg and his co-conspirators attending multiple meetings with Commissioner Causey, including in this federal district, where they offered bribes disguised as legitimate donations to Commissioner Causey's re-election campaign, and forming an 'independent expenditure committee' composed of two companies to use as a conduit for transferring the bribe money, in exchange for Commissioner Causey removing the North Carolina Department of Insurance's Senior Deputy Commissioner, who was responsible for overseeing regulation and the periodic examination of Lindberg's insurance companies.

For example, on March 5, 2018, during a meeting at the Statesville Regional Airport, Lindberg offered to create the independent expenditure committee to support Commissioner Causey's re-election campaign and fund it himself with between $1,000,000 and $2,000,000. On May 16, 2018, Commissioner Causey met Lindberg at his personal residence in Durham County, North Carolina. At this meeting, Lindberg offered to funnel $500,000 to Commissioner Causey's re-election campaign by donating it to a North Carolina State Political Party for Commissioner Causey's benefit.

On May 29, 2018, Commissioner Causey met Lindberg again at his personal residence in Durham County, North Carolina. At this meeting, Lindberg confirmed that he intended to funnel $2,000,000 to Commissioner Causey by paying $1,500,000 to the sham independent expenditure committee and $500,000 to the North Carolina State Polity Party, and was prepared to "put the money in the bank."

(Id. ¶¶ 32-35). The complaint further alleges that "[o]n June 8, 2018, one . . . day after [defendant Affinity] executed the Agreement, [defendant] Lindberg wrote two . . . checks totaling $1,500,000 to fund the sham independent expenditure committee." (Id. ¶ 36).

According to the complaint, upon information and belief "[d]efendants concealed Lindberg's unlawful conduct from McIlroy, who was [d]efendants' agent in the transaction with Dash, and in doing so, concealed Lindberg's unlawful conduct from Dash." (Id. ¶ 38). Allegedly, "Dash could not, through any due diligence, have discovered Lindberg's secret efforts to bribe

---

of defendant Lindberg as summarized in the instant complaint. (See Indictment, United States v. Lindberg, No. 5:19-CR-22-MOC-DSC (W.D.N.C. March 18, 2019)).

7

Commissioner Causey in North Carolina." (Id.). In addition, "[h]ad Dash known about [defendant] Lindberg's unlawful conduct, it would have immediately terminated the negotiations with [defendant Affinity] and never signed the Agreement." (Id.).

According to the complaint, "[w]hen Bank of America learned of [defendant] Lindberg's indictment and underlying criminal conduct occurring in North Carolina, the situs of its business headquarters, it immediately terminated the BOA Contract during the Initial Term," allegedly constituting a "breach of the BOA Contract." (Id. ¶ 39). "Upon information and belief, the sole reason Bank of America terminated the BOA Contract was to distance itself from the stain associated with [defendant] Lindberg and his unlawful activities in North Carolina." (Id. ¶ 40).

"Dash attempted to salvage the business relationship by asking Bank of America if it would separately contract with Dash to allow it to continue providing the first party customer care contract work Dash provided for years under the BOA Contract." (Id. ¶ 41). According to the complaint, "Bank of America declined the request and made it clear that it would not execute future contracts with Dash because it was tied to [defendant Affinity] and, therefore, [defendant] Lindberg." (Id.).

"On March 5, 2020, a jury convicted [defendant] Lindberg of conspiracy to commit honest services wire fraud and bribery and, on August 19, 2020, the court sentenced Lindberg to serve [87] months in federal prison." (Id. ¶ 45; see Judgment, United States v. Lindberg, No. 5:19-CR-22-MOC-DSC (W.D.N.C. Sept. 4, 2020)).

Additional allegations and assertions set forth in the complaint will be addressed in the analysis herein.

8

## COURT'S DISCUSSION

A.   Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).[5]

B.   Analysis

1.   Fraudulent Concealment

Under Illinois law,[6] "[i]n order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose that fact

---

[5] Because the court holds, herein, that plaintiff fails to state a claim pursuant to Rule 12(b)(6), the court does not address in detail defendants' additional arguments that dismissal is required under Rule 12(b)(3) for improper venue, or in the alternative, that venue should be transferred. For purposes of the instant motion, the court finds that venue is proper in this district.

[6] For purposes of the instant motion, both plaintiff and defendants apply Illinois law to plaintiff's fraudulent concealment claim. (See, e.g., Defs' Mem. (DE 28) at 11-20; Pl's Mem. (DE 32) at 25-33). In this case, the Agreement provides that it "shall be governed and construed in accordance with the internal laws of the State of Illinois." (Compl. Ex. A (DE 22-1) at 3). Generally, "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262 (1980). While the choice of law principle applicable to related tort claims is unsettled, generally such a choice of law provision is "sufficiently broad to encompass contract-related tort claims." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999). In any event, the parties do not identify any material difference between North Carolina law and Illinois law regarding fraudulent concealment. Therefore, for purposes of the instant motion, the court applies Illinois law.

to plaintiff." Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 500 (1996). "A duty to disclose a material fact may arise out of several situations." Id. "First, if plaintiff and defendant are in a fiduciary or confidential relationship, then defendant is under a duty to disclose all material facts." Id. "Second, a duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." Id. "This position of superiority may arise by reason of friendship, agency, or experience." Id.

In addition, "[t]he heightened pleading standard of Rule 9(b) . . . applies to fraudulent concealment claims." Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 571 (7th Cir. 2012). Thus, a "plaintiff has the burden to plead with specificity . . . the existence of a fiduciary or special relationship." Greenberger v. GEICO Gen. Ins. Co., 631 F.3d 392, 401 (7th Cir. 2011). "The special relationship threshold is a high one: the defendant must be clearly dominant, either because of superior knowledge of the matter derived from overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side." Wigod, 673 F.3d at 572.[7] "Factors to be considered in determining the existence of a confidential relationship include the degree of kinship of the parties; any disparity in age, health, and mental condition; differences in education and business experience between the parties; and the extent to which the allegedly servient party entrusted the handling of her business affairs to the dominant party, and whether the dominant party accepted such entrustment." Id.

    a.    Fiduciary Duty or Special Relationship

Here, plaintiff's fraudulent concealment claim fails as a matter of law because plaintiff has not pleaded with specificity that defendants had the requisite fiduciary or special relationship to

---

[7] Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

10

give rise to a duty to disclose alleged illegal conduct of defendant Lindberg. First, plaintiff does not assert that either Linberg or Affinity had a fiduciary relationship with plaintiff, and none may be inferred from the facts of the complaint. Second, while plaintiff asserts that defendants "owed a special duty" to plaintiff, (compl. ¶ 48), plaintiff does not allege facts to permit a plausible inference of such a duty outside of a fiduciary relationship.

For example, plaintiff suggests that a special relationship existed between the parties because "Dash shared confidential and proprietary information with [defendant Affinity] about Dash's customer care contracts." (Id.). This allegation is insufficient to establish the requisite special relationship on multiple levels. As an initial matter, provision of confidential information to another party in itself is not enough to meet the standard. Rather, trust and confidence must be placed in another in such a manner that it "plac[es] defendant in a position of influence and superiority over plaintiff." Connick, 174 Ill. 2d at 500. In addition, a plaintiff must allege "with specificity" the special relationship between the parties. Greenberger, 631 F.3d at 401. Here, plaintiff does not allege, much less with specificity, in what manner the provision of confidential information "about Dash's customer care contracts" placed defendant in a position of influence and superiority over plaintiff. (Compl. ¶ 48).

The complaint suggests, to the contrary, that the parties were engaging in an "arms length transaction" in a business context, that has no indicia of the requisite special relationship to establish a duty to disclose. Wigod, 673 F.3d at 572. There is, for instance, "no disparity in experience or knowledge such that defendants could be said to have gained influence and superiority over the plaintiff." Id. Nor is there any allegation as to "kinship of the parties; any disparity in age, health, and mental condition; differences in education and business experience

between the parties; [nor] the extent to which the allegedly servient party entrusted the handling of [its] business affairs to the dominant party." Id.

Plaintiff also suggests a special relationship arose between the parties by virtue of a joint venture created by the Agreement. Plaintiff's fraudulent inducement claim, however, is that "[b]y concealing and withholding material information from [plaintiff], [d]efendants induced [plaintiff] to enter into the Agreement and assign its contracts." (Compl. ¶ 54 (emphasis added)). Thus, existence of a joint venture arising from Agreement could not have created a duty to disclose prior to entry into the Agreement.

In any event, the plain terms of the Agreement do not create a joint venture that gives rise to a special relationship between the parties requiring a duty to disclose. A joint venture requires, among other elements, "some degree of joint proprietorship or mutual right to exercise control over the enterprise; and . . . provision for the joint sharing of profits and losses." Holstein v. Grossman, 616 N.E.2d 1224, 1236 (1993). Here, the Agreement requires plaintiff "to assign" and defendant Affinity to "assume and acquire certain contracts" for "monetary consideration," (DE 1-1 at 1), and it does not say anything about "joint proprietorship or mutual right to exercise control over [an] enterprise." Holstein, 616 N.E.2d at 1236. Likewise, it requires defendant Affinity to pay to plaintiff "a percentage of gross revenues," (DE 1-1 at 1), and it does not provide for joint sharing of profits and losses. Holstein, 616 N.E.2d at 1236. Thus, there is no basis to infer a duty to disclose arising from a joint venture.

Plaintiff also asserts that a special duty arose because "the parties discussed [defendant Affinity's] commitment to continuing [plaintiff's] performance under [assigned] contracts since the success of the Agreement depended on that performance." (Compl. ¶ 48; Resp. (DE 32) p. 30). This assertion again is unavailing to establish a special duty, where it is based upon

12

obligations allegedly arising after the Agreement arose. Furthermore, the obligations in the Agreement, falling short of a joint venture, do not create a special relationship requiring a duty to disclose.[8]

In sum, plaintiff's fraudulent concealment claim fails as a matter of law because plaintiff fails to allege that defendants had a duty to disclose alleged unlawful conduct of Lindberg.

      b.      Knowledge and Agency

In addition and in the alternative, plaintiff has not alleged facts giving rise to a plausible inference that defendant Affinity had knowledge of defendant Lindberg's unlawful conduct. See Toulon v. Cont'l Cas. Co., 877 F.3d 725, 737 (7th Cir. 2017) (holding that fraudulent concealment claim fails under Illinois law where the defendant did not "know" of the fact allegedly concealed).

Plaintiff suggests that Lindberg's knowledge may be imputed to defendant Affinity because defendant Lindberg is its "alter ego." (Compl. ¶ 14). Plaintiff alleges, for example, that defendant Lindberg "is the sole managing member of Eli Global, which is . . . the sole managing member of GCC Holdings, which is the sole owner of [defendant Affinity." (Id.). Plaintiff asserts, "[u]pon further information and belief, Lindberg . . . completely dominated and controlled, and dominates and controls, the decisions and operations of Eli Global, GCC Holdings and Affinity Global." (Id.).

These allegations, however, are insufficient to give rise to a plausible inference of alter ego liability or piercing the corporate veil of defendant Affinity. "Stock control and common officers and directors are generally prerequisites to piercing the corporate veil." C M Corp. v. Oberer Dev. Co., 631 F.2d 536, 539 (7th Cir. 1980). "However, those factors are not sufficient by themselves

---

[8] In addition, as to defendant Lindberg specifically, plaintiff does not allege that defendant Lindberg had any relationship, fiduciary or otherwise, with plaintiff that would give rise to a duty to disclose his unlawful conduct to plaintiff. As discussed in further detail below, plaintiff fails to allege facts allowing a disregard of corporate formalities and agency principles, necessary to treat defendant Affinity and Lindberg as one and the same.

13

to invoke the doctrine for such factors are common business practice and exist in most parent and subsidiary relationships." Id. As such, "Illinois courts consider the following factors when determining whether there is sufficient 'unity of interest' to justify disregarding the corporate form":

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371, 379 (7th Cir. 2008). "In any event, it must be shown that another entity actually dominated a sham corporation." C M Corp., 631 F.2d at 539.

Here, plaintiff has not alleged facts pertaining to the aforementioned factors, to permit an inference that defendant Affinity was a sham corporation. There is no allegation of inadequate capitalization, failure to observe corporate formalities, absence of corporate records, commingling of funds, nonfunctioning of other officers or directors, or operation of a mere facade or sham. (See, e.g., Compl. ¶¶ 11-14). That, in itself, is fatal to plaintiff's assertion of alter ego liability.

Furthermore, the complaint suggests the contrary, where it alleges that "Elmalem spoke with . . . McIlroy, [defendant Affinity's] new President and Chief Operating Officer," and that they discussed the possibility of plaintiff "outsourcing its first party customer care contract work to [defendant Affinity], which [defendant Affinity] would perform from its new office in Dallas, Texas." (Compl. ¶ 18). In addition, "McIlroy was [defendant Affinity's] designate agent for the completed transaction," "McIlroy discussed the terms of the proposed deal with Vishal Kumar, Eli Global's portfolio manager," and McIlroy represented that defendant Affinity's "executives,

Case 5:20-cv-00625-FL   Document 34   Filed 01/11/22   Page 14 of 19

including Lindberg, supported the deal." (Id. ¶ 21). At the same time, according to the complaint, "[d]efendants concealed [defendant] Lindberg's unlawful conduct from McIlroy." (Id. ¶ 38). As such, the complaint alleges the opposite of several veil piercing factors, including that defendant Affinity engaged in conduct through McIlroy, that defendant Affinity was set up to have its own office, and that defendant Affinity and Eli Global each had their own executives. Plaintiff's assertion that McIlroy was acting "on behalf of [defendant Affinity] and Lindberg," and that Lindberg "ultimately made the decision to consummate the deal," (Compl. ¶ 22), in this context, is not determinative to piercing the corporate veil, where there is no factual support for other key pertinent factors. In sum, plaintiff fails to allege that defendant Lindberg was the alter ego of defendant Affinity.

Plaintiff also relies upon common law agency principles to impute knowledge of defendant Lindberg to defendant Affinity. The complaint, however, fails on the basis of the agency rule that "knowledge of a corporate officer or agent acquired outside the scope of his or her powers or duties or when not acting for or in behalf of the corporation is not imputable to the corporation." United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cty., Wis., 965 F.2d 311, 316–17 (7th Cir. 1992). Here, the alleged unlawful conduct of defendant Lindberg falls within this rule. Defendant Lindberg and other co-conspirators are alleged to have "attend[ed] multiple meetings with Commissioner Causey" in North Carolina, "where they offered bribes" to him "in exchange for Commissioner Causey removing [his deputy] who was responsible for overseeing regulation and the periodic examination of [defendant] Lindberg's insurance companies." (Compl. ¶ 32). There is no allegation or implication that any of the alleged unlawful conduct was taken on behalf of defendant Affinity, as opposed to defendant Lindberg's "insurance

15

companies." (Id.). As such, under this agency rule, knowledge of defendant Lindberg about his allegedly unlawful bribes of Commissioner Causey is not imputed to defendant Affinity.

Plaintiff asserts an exception to this rule on the basis that defendant Lindberg was the "sole actor" for defendant Affinity. "[I]n Illinois where the self-interested agent is the sole or an essential representative of the corporation in the transaction in question, his knowledge is held to be imputable to the corporation." Ash v. Georgia-Pac. Corp., 957 F.2d 432, 436 (7th Cir. 1992). In this case, however, the facts alleged in the complaint do not give rise to a plausible inference that defendant Lindberg was the "sole actor" for defendant Affinity in the transaction in question. To the contrary, the complaint alleges that "[d]uring the negotiations, McIlroy was [defendant Affinity's] designate agent for the contemplated transaction." (Compl. ¶ 21). McIlroy allegedly made numerous representations to plaintiff during those negotiations, including that "Affinity Global's executives, including Lindberg, supported the deal." (Id.). McIlroy also "discussed the terms of the proposed deal with Vishal Kumar, Eli Global's portfolio manager," (id. ¶ 22), and he personally executed the Agreement as well as the May 12, 2018, letter agreement that preceded it, on behalf of defendant Affinity, as its "President & COO" (DE 1-1 at 5, 11).

Because of the alleged actions by McIlroy, and alleged involvement of Vishal Kumar, it is not plausible to infer that defendant Lindberg was "the sole or an essential representative of the corporation in the transaction in question." Ash, 957 F.2d at 436 (emphasis added). Given McIlroy's alleged role in negotiating and executing the Agreement, it is not determinative that plaintiff also alleges that McIlroy discussed the deal with defendant Lindberg, or that defendant Lindberg ultimately "made the decision to consummate the deal with Dash and directed McIlroy to sign the agreement." (Compl. ¶ 22). Indeed, the complaint does not allege any direct

16

communications between defendant Lindberg and plaintiff, or that he acted as a representative in any capacity, but rather that McIlroy played that role.

Cases cited by plaintiff to support its agency and alter ego theories of relief are instructively distinguishable. For example, in First National Bank of Cicero v. United States, 625 F. Supp. 926 (N.D. Ill. 1986), the court held that a bank seeking to recover loan collateral was precluded from doing so, where its own bank officer was "indicted by a federal grand jury and pled guilty to receiving kickbacks from the loans." Id. at 927. It was undisputed in that case that the bank officer "knew that the loans were fraudulently acquired, that their proceeds would be to a considerable extent diverted from their represented purposes, and that he would benefit personally from some of the diversion." Id. at 927-928.

The key differences between First National Bank and the instant case are that the bank there sought to recover from and retain benefit of the transaction that was later discovered fraudulent, and that its officer had engaged in illegal conduct with respect to that very transaction. The first difference is critical to the application of the "sole representative" exception, where the exception provides that "the principal will be charged with the agent's knowledge if the principal seeks to retain the benefit of the transaction." Id. at 932 (emphasis added). This because the exception is grounded in the recognition that if the principal "retains the fruits of the agent's act, . . . he must in fairness be charged with the agent's knowledge." Id. The second difference is critical to the inquiry whether the agent was acting unlawfully "in the course of the principal's business," id. at 931, unlike here where the unlawful conduct took place with respect to an unrelated transaction. Because of these differences, First National Bank is inapposite.

Likewise, In re Manzanares, 345 B.R. 773 (Bankr. S.D. Fla. 2006) is inapposite. There, the court imputed knowledge of a creditor (insurance company) to its attorney who was conducting

17

litigation on the creditor's behalf, in violation of a discharge injunction, where the creditor had knowledge of the discharge injunction. See id. at 791. In contrast to the instant case, information allegedly known by the principal (the insurance company) was directly related to the transaction in question (litigation by the attorney for the insurance company in violation of the bankruptcy discharge). See id. at 791-792. The instant case involves no such connection between the unlawful conduct and actions of the alleged principal, defendant Lindberg, and the alleged "local agent," McIlroy. (Pl's Resp. (DE 32) at 28).

Finally, cases cited by plaintiff concerning the standard for pleading piercing the corporate veil are unhelpful because they all predate, and thus do not address, the Iqbal/Twombly requirements that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," Iqbal, 556 U.S. at 678, and that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. For example, the most recent case cited by plaintiff, Flentye v. Kathrein, 485 F. Supp. 2d 903 (N.D. Ill. 2007), relies upon the superseded rule that dismissal is appropriate only "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 911 (quoting Conley v. Gibson, 355 U.S. 41, 45–46 (1957)). These cases thus do not address veil piercing claims under the necessary pleading requirements.

In sum, plaintiff's fraudulent concealment claim fails because it is not plausible to infer from the facts alleged that defendant Affinity had knowledge of defendant Lindberg's unlawful conduct. Therefore plaintiff's fraudulent concealment claim must be dismissed.

2. Unfair and Deceptive Trade Practices

Plaintiff's statutory unfair and deceptive trade practices claims are premised upon defendants' fraudulent concealment. (See, e.g., Compl. ¶¶ 76, 81, 87; Pl's Br. (DE 32) at 37-39

("Because [plaintiff] properly asserts a claim against [d]efendants for fraudulent concealment . . . [plaintiff's] allegations necessarily state a claim under [N.C. Gen. Stat. § 75-1.1].").

Therefore, where plaintiff fails to state a claim of fraudulent concealment against defendants, plaintiff's statutory unfair and deceptive trade practices claims also fail as a matter of law.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss (DE 26) is GRANTED. Plaintiff's claims are DISMISSED for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). The clerk is DIRECTED to close this case.

SO ORDERED, this the 11th day of January, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge